**Affirmed and Opinion filed May 5, 2016.**



In The

# Fourteenth Court of Appeals

NO. 14-15-00244-CR
NO. 14-15-00245-CR
NO. 14-15-00246-CR
NO. 14-15-00247-CR

**WALTER LOUIS JACKSON, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause Nos. 12-DCR-062008, 12-DCR-062010,
12-DCR-062011 & 12-DCR-062012**

## O P I N I O N

This case concerns the exclusion of evidence seized from an apartment-home and garage pursuant to search warrants based, in part, upon two warrantless dog sniffs. Appellant Walter Louis Jackson, Jr. appeals his convictions for four counts of possession with intent to deliver. The jury found appellant guilty on all

counts and sentenced him to 75 years in prison.[1]

Appellant's primary issues on appeal concern whether the warrantless use of the narcotics-detection dog at his apartment and garage was unconstitutional and whether officers had sufficient probable cause to subsequently obtain search warrants for those locations. Appellant raises additional issues regarding the sufficiency of the evidence, ineffective assistance of counsel, alleged due process and *Brady*[2] violations, and the denial of his motion for mistrial.

## FACTUAL AND PROCEDURAL BACKGROUND

After receiving a tip from a confidential informant that appellant was selling drugs in the Katy area, the Fort Bend County Sheriff's Department began an investigation in February 2012. By October, investigators believed they had gathered sufficient information to link appellant to apartment #10206 at The Residences at Cinco Ranch. On October 24, 2012, an investigator asked Officer Hricko to have his canine partner conduct a dog sniff of appellant's apartment door and garage. The dog alerted Hricko to the presence of narcotics at both the apartment and garage. Based on the dog's positive alerts and other information the officers collected during the investigation, officers obtained a search warrant for the garage and apartment later that evening.

Officers first executed the search warrant for the apartment. The only person inside at the time was Laura Cline, appellant's girlfriend. In the apartment, officers

---

[1] Appellant was indicted in Cause No. 12-DCR-062008 for possession with the intent to deliver 400 or more grams of hydrocodone ("Count One"); Cause No. 12-DCR-062010: possession with intent to deliver four grams or more but less than 200 grams of oxycodone ("Count Two"); Cause No. 12-DCR-062011: possession with intent to deliver four grams or more but less than 200 grams of fentanyl ("Count Three"); and Cause No. 12-DCR-062012: possession with intent to deliver more than four grams but less than 200 grams of cocaine ("Count Four").

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

found the following items: marijuana, pills, cocaine, two scales, money, a brown bag containing two large pharmacy bottles, a key, and a garage remote. Officers then executed the search warrant for the garage. Inside, they recovered pills, money, cocaine, the drug Ecstasy, another scale, and a garage remote. Appellant was subsequently charged with four counts of possession with intent to distribute a controlled substance.

Appellant filed a motion to suppress the contraband recovered as a result of the searches, arguing that the use of the narcotics-detection dog at both locations violated his Fourth Amendment rights under *United States v. Jardines*, 133 S. Ct. 1409 (2013). The trial judge denied appellant's motion with respect to the items found in both the garage and the apartment.[3] Following a jury trial, appellant was convicted on all four counts and sentenced to 75 years in prison.[4]

### ISSUES AND ANALYSIS

On appeal, appellant raises seven issues: (1) the warrantless dog sniffs were unconstitutional under *Jardines*, and although *Jardines* had not been decided at the time, Texas does not recognize a good-faith exception to the exclusionary rule; (2) the search warrants failed to establish probable cause; (3) appellant did not have exclusive possession of the place where the contraband was found so as to affirmatively link him to the contraband; (4) appellant received ineffective assistance of counsel at trial; (5) the State's failure to preserve evidence violated appellant's due process rights; (6) the prosecution violated its duty to provide appellant a fair trial; and (7) the trial court's denial of appellant's motion for a

---

[3] Appellant also moved to suppress contraband found during a traffic stop conducted on October 24, 2012. The trial court found that the officers did not have probable cause to stop the vehicle and granted appellant's motion with respect to the traffic stop.

[4] Appellant was sentenced to 75 years for both Counts One and Four and 50 years for Counts Two and Three. The judge ordered that appellant's sentences be served concurrently.

mistrial was an abuse of discretion.

## I.    Sufficiency of the Evidence

In his third issue, appellant challenges the legal sufficiency of the evidence to support his conviction.[5] Specifically, appellant alleges that there is insufficient evidence of affirmative links showing he exercised care, custody, or control over the controlled substances found in the apartment and garage.

In evaluating a sufficiency challenge, we view the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The jury "is the sole judge of credibility and weight to be attached to the testimony of witnesses." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *See Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Id.* at 8.

The jury found appellant guilty of four counts of felony possession with intent to distribute a controlled substance. "Possession" is defined as "actual care, custody, control, or management." Tex. Penal Code § 1.07(a)(39); Tex. Health & Safety Code § 481.002(38). To prove unlawful possession of a controlled

---

[5] We address appellant's third issue first because success on that issue would entitle appellant to a rendition of judgment in his favor rather than a remand to the trial court. *See Lucas v. State*, 245 S.W.3d 611, 612 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

substance, the State must establish that the accused exercised care, control, or management over the contraband and knew the substance was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). The elements of possession may be proven through direct or circumstantial evidence, although the evidence must establish that the accused's connection with the substance was more than merely fortuitous. *Id.* at 405–06.

When the accused is not in exclusive possession of the place where the contraband is found, the reviewing court must examine the record to determine if there are additional independent facts that "affirmatively link" the defendant to the contraband. *Id.* at 406; *Torres v. State*, 466 S.W.3d 329, 331–32 (Tex. App.—Houston [14th Dist.] 2015, no pet.). This requirement protects innocent bystanders from conviction based solely on their proximity to someone else's contraband. *Poindexter*, 153 S.W.3d at 406. Courts have identified the following factors that may help to show an accused's affirmative links to a controlled substance: (1) the accused's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the accused's proximity and the accessibility of the narcotic; (4) whether the accused was under the influence of narcotics when arrested; (5) whether the accused possessed other contraband or narcotics when arrested; (6) whether the accused made incriminating statements when arrested; (7) whether the accused attempted to flee; (8) whether the accused made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the accused owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the accused was found with a large amount of cash; and (14) whether the conduct of the accused indicated a consciousness of guilt. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App.

5

2006). Additionally, a large quantity of contraband may be a factor affirmatively linking the appellant to the contraband. *See Olivarez v. State*, 171 S.W.3d 283, 291–92 (Tex. App.—Houston [14th Dist.] 2005, no pet). No set formula necessitates a finding of an affirmative link sufficient to support an inference of knowing possession; affirmative links are established by the totality of the circumstances. *See Hyett v. State*, 58 S.W.3d 826, 830 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). It is "not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Evans*, 202 S.W.3d at 162.

**A. Sufficiency of the Evidence to Link Appellant to the Contraband Found in the Apartment**

Appellant argues that the evidence is insufficient to link him to the contraband found inside the apartment because he did not have control over the contraband. He points out that Cline was the only person inside the apartment when the officers executed the warrant. However, even if appellant did not have exclusive possession of the apartment, an analysis of the affirmative links reflects that the evidence is sufficient to support appellant's convictions.

It is undisputed that the lease to the apartment was in Cline's name alone. Cline testified that although she leased the apartment, appellant paid the rent and bills with money he made by selling drugs. Appellant claims he was not living at the apartment at the time of the search. However, Cline testified that appellant was living with her at that time. She stated that he slept at the apartment the night before the search, and he had his own key to the apartment. Although appellant disputes Cline's testimony, the jury was free to believe Cline's version of events over appellant's version. *See Dobbs*, 434 S.W.3d at 170 (providing that jury is the sole judge of the credibility of witnesses and weight of the evidence); *Thomas*, 444

6

S.W.3d at 10 (providing that jury may choose to believe or disbelieve any portion of the witnesses' testimony).

During the execution of the warrant, officers recovered various pieces of mail addressed to appellant, including a recent cable bill for the apartment in appellant's name. Additionally, male clothing was found in the dresser in the bedroom, and a photo of appellant was displayed in the living room. These factors support an inference that appellant had a right of possession to or control over the place where contraband was found. *See Poindexter*, 153 S.W.3d at 411 (holding that a utility bill addressed to the defendant at the house, among other things, supported a finding that the defendant lived there); *Wright v. State*, 401 S.W.3d 813, 819 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (determining appellant had right of possession or control over grow house where the electric bill was in his name, a neighbor saw him rewiring the house and changing the electrical box, and his fingerprints were found on marijuana-growing equipment inside); *Hargrove v. State*, 211 S.W.3d 379, 386 (Tex. App.—San Antonio 2006, pet. ref'd) (concluding that defendant had right of possession to girlfriend's home, where contraband was found, when affirmative links showed defendant had a key, often stayed overnight at the home, paid bills associated with the home, and utility bill in defendant's name was found at house).

In the kitchen cabinet next to the sink, officers located marijuana and pills prescribed to Cline. Cline testified that the marijuana belonged to her, not appellant. Officers also found a scale in the kitchen; Officer Baker testified that it was not a typical food scale. Baker stated that the scale would weigh amounts as small as a tenth of a gram and was the kind typically used by individuals who package and sell drugs. Most of the contraband found in the apartment was located

7

in a cabinet above the refrigerator.[6] Cline testified that appellant specifically told her not to touch the cabinet above the refrigerator and that she saw him place the bag containing cocaine there. She stated that the drugs found above the refrigerator belonged to appellant. At trial, Newton testified that while appellant is 6'4", Cline is much shorter and would have difficulty reaching the cabinet. The cabinet contained a white plastic bag and a brown paper bag. Officers found cocaine in both bags, as well as a beaker in the white bag. Officer Baker testified that in his experience, beakers are used in the process of converting powdered cocaine into crack cocaine. Cline testified that she had seen appellant with the beaker, although she did not see him use it to make crack cocaine. She stated that appellant did tell her he made crack, but he never made it at their apartment.

In the bedroom, officers found two empty, 500-count bottles of hydrocodone inside a shaving kit. Officer Baker testified that such bottles are sent to pharmacies by the manufacturer and stated that "there would be no reason for the general public to ever have access to those." The shaving kit also contained approximately 66 grams of suboxone. Additionally, in the drawer containing men's underwear, officers found stacks of twenty-dollar bills. Cline testified that the money and clothing belonged to appellant, and that no other man had ever slept in her apartment. Elsewhere in the apartment, officers also found a second scale that appeared to have cocaine residue on it, as well as several small baggies of cocaine.[7]

The location of the contraband further supports the inference that appellant had care, custody, control, or management of the contraband. Although the narcotics and scales were not in plain view in the apartment, they were hidden in

---

[6] From the cabinet, officers recovered 137.7 grams of cocaine, 96.13 grams of hydrocodone, 13.13 grams of oxycodone, 21.5 grams of suboxone, some fentanyl, and a beaker.

[7] It is unclear from the record where the officers found the baggies or the second scale.

8

areas that would have been readily accessible by appellant. *See Evans*, 202 S.W.3d at 162 n.12 (listing "the defendant's proximity to and the accessibility of the narcotic" as a link to be considered); *Haggerty v. State*, 429 S.W.3d 1, 7 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (considering as affirmative links contraband secreted in kitchen cabinets, oven, trash, and bedroom closets, as well as scales and tools for cooking crack cocaine). Cline's testimony regarding appellant's use of the cabinet and the clothing in the bedroom links appellant to both locations where officers discovered contraband. Viewing the evidence in the light most favorable to the verdict, the jury could have determined beyond a reasonable doubt that appellant knowingly exercised actual care, custody, control or management of the apartment and the items found within it. *See id.*; *Hargrove*, 211 S.W.3d at 386 (concluding that defendant had possession of or right of control over girlfriend's home where evidence showed he paid bills there, often spent the night, and had a key to the home).

## B. Sufficiency of the Evidence to Link Appellant to the Contraband Found in the Garage

Appellant also claims the evidence is insufficient to affirmatively link him to the contraband recovered from garage #A3. We disagree. First, Newton testified that during his extensive surveillance of appellant, he saw appellant use a remote control to open the garage on at least one occasion, but he never saw Laura Cline enter the garage. Additionally, the apartment courtesy officer testified that although he observed appellant's car parked inside the garage, he could not recall ever seeing Cline's vehicle parked there. Next, Cline testified that there was only one remote control to the garage, and only appellant had access to it. She stated that even if she asked the front office, she could not get into the garage. Again, it is the jury's responsibility to assess a witness's credibility, and the jury was free to give more credence to Cline's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614

9

(Tex. Crim. App. 1986).

Inside the garage, officers found over 100 xanax pills, a box of fentanyl, 4 grams of ecstasy, approximately 7 grams of cocaine, 7 grams of oxycodone, approximately 20 grams of suboxone, and almost 900 grams of hydrocodone in pharmacy-grade bottles. They also recovered another scale and a stack of $100 bills. Additionally, officers found men's clothing, photos of appellant, mail addressed to him, and paperwork in appellant's name. Testimony from multiple witnesses demonstrates that appellant had exclusive access to the garage, and the items found inside also connect him to the garage. Furthermore, the enclosed nature of the garage and the large quantity of narcotics found there also serve to affirmatively link appellant to the contraband found inside. *See Evans*, 202 S.W.3d at 162 n.12 (listing "whether the place where the drugs were found was enclosed" as a link to be considered); *Gregory v. State*, 159 S.W.3d 254, 260 (Tex. App.—Beaumont 2005, pet. ref'd) (considering as affirmative links the large quantity of contraband, which was conveniently accessible to a defendant, that paraphernalia were present, and that the place where contraband was found was enclosed). Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have determined beyond a reasonable doubt that appellant knowingly exercised actual care, control, custody, or management of the garage and the contraband recovered from inside. We overrule appellant's third issue.

## II.   Constitutionality of the Dog Sniffs

In his first issue, appellant contends that the dog sniffs conducted at his apartment door and garage were unconstitutional based on the United States Supreme Court's ruling in *Florida v. Jardines*, 133 S. Ct. 1409 (2013).[8] In

---

[8] The Supreme Court decided *Jardines* after the execution of the search warrants but before the hearing on appellant's motion to suppress.

*Jardines*, the Court determined whether an officer's warrantless use of a narcotics-detection dog on the front porch of a suspect's home was a search within the meaning of the Fourth Amendment to the United States Constitution. 133 S. Ct. at 1413–14. The Court concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Id.* at 1417–18. In reaching this conclusion, the Court noted that "the area immediately surrounding and associated with the home—what our cases call the curtilage—[is] part of the home itself for Fourth Amendment purposes." *Id.* at 1414 (internal quotations omitted). The Court stated that "[t]his area around the home is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened." *Id.* at 1415 (internal quotations omitted). The Court concluded that the front porch is "the classic exemplar" of an area that is part of the curtilage of the home. *Id.*

Because the officers' investigation occurred in a constitutionally protected area, the Court turned to the question of whether the investigation was accomplished through an unlicensed physical intrusion. *Id.* The Court concluded that there is no customary invitation to approach the front door of a home and use trained police dogs in an attempt to discover incriminating evidence. *Id.* at 1415–16. The Court determined that the homeowner did not explicitly or implicitly permit the officers to gather information by physically entering and occupying the curtilage of the home. *Id.* at 1414–16. Therefore, the use of trained narcotics-detection dogs to investigate the front porch of the home was a search within the meaning of the Fourth Amendment. *Id.*

In *State v Rendon*, the Court of Criminal Appeals relied on the *Jardines* court's reasoning and concluded that police officers' use of a dog to conduct a canine-narcotics sniff at the front door of the defendant's apartment-home was a

physical intrusion into the home's curtilage that exceeded the scope of any express or implied license and thereby constituted a warrantless search in violation of the Fourth Amendment of the United States Constitution. 477 S.W.3d 805, 806, 808– 10 (Tex. Crim. App. 2015).

Appellant argues that both dog sniffs occurred within his home's protected curtilage and therefore they were unconstitutional searches under *Jardines*. We conclude that under the recent decision in *State v. Rendon*, the use of the narcotics-detection dog at the front door of appellant's apartment-home was a warrantless search in violation of the Fourth Amendment of the United States Constitution. *See id*. In reaching its decision, the *Rendon* court focused on where the officer used the narcotics-detection dog. The canine officer testified that he took his dog up the stairs to the front door of the apartment and stated that the sniff occurred "at the bottom left portion of the front door." *Id.* at 807. He testified that "he deployed Canine Baco on the exterior of the apartment, and Baco indicated a positive alert on the exterior of the door." *Id.* The court held that "the officers' conduct in bringing a trained drug-detection dog up to the threshold or area outside of appellee's front door for the purpose of conducting a canine-narcotics sniff was an 'unlicensed physical intrusion' onto the curtilage of his home that constituted a search in violation of the Fourth Amendment." *Id.* at 808 (citing *Jardines*, 133 S. Ct. at 1415).

Similarly, Officer Hricko testified that he knew specifically which unit belonged to appellant and that he led the dog up the stairs toward that unit. Hricko stated that "[w]hen [the dog] approached [appellant's] door, [the dog] put his nose to the bottom corner of that door. Breathing changed, body changed, tail began wagging, and he sat. His final response, he came to a sitting position." Hricko further testified that the dog alerted at "the bottom corner" of appellant's door. He

12

stated that "odor normally comes from the seams, so that's why we work on . . . the lower seams of the door. He can . . . alert on the handles, too, but I always try to put [him] where the odor comes out of it."

We conclude that the use of the narcotics-detection dog at the front door of appellant's apartment-home is indistinguishable from the way that officers deployed the narcotics-detection dog in *Rendon*. *See id*. at 806–08. Therefore, we hold that the narcotics-detection dog sniff at the door of appellant's apartment-home was a warrantless search in violation of the Fourth Amendment of the United States Constitution. *See id*. at 808–11.

The use of the drug dog at appellant's garage presents a more difficult question. The garage in question is directly across the parking lot from appellant's apartment and is the third unit from the left in a row of nine garages. To reach the garage from appellant's apartment, a person would have to walk down two common stairways and cross a common parking lot. Officer Hricko testified that about a minute elapsed between the dog's sniff of the apartment and the dog's sniff of the garage.[9] He stated that unlike the dog sniff at the apartment, he did not initially know which garage unit was used by appellant. Hricko stated that the dog passed over several other garages before alerting to the presence of narcotics at #A3. Hricko testified that he put the dog's nose on the corner of each garage until he reached #A3. He stated that at that time, the dog's body changed, his breathing changed, and he "came to final response on the corner of it."

Presuming without deciding that the narcotics-detection dog sniff at the door to appellant's garage was a warrantless search in violation of the Fourth Amendment of the United States Constitution, the information in the search-

---

[9] Appellant estimates that "the distance from the base of the apartment steps to the garage appears to be approximately 3 car lengths."

13

warrant affidavit other than the statements regarding the narcotics-detection dog was acquired independently from the use of the dog and in a lawful manner. Thus, the search warrant would not be rendered invalid if, putting aside all statements in the affidavit regarding the narcotics-detection dog sniffs at the apartment and garage, the remaining information in the affidavit clearly established probable cause. *See United States v. Karo*, 468 U.S. 705, 720–21 (1984); *State v. Cuong Phu Le*, 463 S.W.3d 872, 877 (Tex. Crim. App. 2015); *Wright*, 401 S.W.3d at 822. We thus turn to appellant's second issue.

## III.    Probable Cause for the Search Warrants

Appellant argues that without the dog-sniff information, the affidavit is insufficient to establish probable cause. In relevant part, the affidavit recites the following:[10]

> On or about February 21, 2012, Affiant learned from a Confidential Informant that Walter Jackson was selling Cocaine and Illegal prescription pills from his residence, a leased garage unit, and from the vehicles he operates and utilizes delivering narcotics to individuals. Affiant believes the CI to be a credible source of information due to the CI providing reliable information in the past that was proven credible in that the information lead to the arrest of individuals found in possession of contraband. After receiving this information, Affiant learned through utilizing Texas Crime Information Center database that Walter Jackson has a criminal history for manufacture/deliver of controlled substance. Affiant also learned that Walter Jackson was a parole transfer for narcotics related convictions out of the State of Louisiana in 2008. Affiant has also during the pendency of this investigation been provided information from different independent sources that Walter Jackson supplies both pills and cocaine to the Katy area bars and individuals in the area. On two separate investigations, parties who have been arrested in drug

---

[10] Officer Newton prepared two separate affidavits for the apartment and garage; however, they are substantively identical. In conducting our review, we put aside all statements in the affidavit regarding the narcotics-detection dog sniffs at appellant's apartment and garage.

investigations Affiant has initiated within the pendency of this investigation, named Walter Jackson as a source for narcotics.

In April, 2012, a reliable Confidential Informant provided information that Walter Jackson was living with his girlfriend Laura Cline at 20900 FM 1093. Affiant was also informed that Laura Cline was involved with helping Walter Jackson obtain pills he could later sell. Subsequently your Affiant learned that Laura Cline and Walter Jackson lived together at 20900 FM 1093, #10206 and also rented Garage #A3 on the same apartment complex premises. Through the course of this investigation, Affiant found the lease for the apartment was listed in Laura Cline's name.

On May 8, 2012, Affiant observed Walter Jackson and Laura Cline meet together in the parking lot near building #10 at the Residences of Cinco Ranch and observed Walter Jackson in a white Chevy Impala (TX 977 KXH) with Laura Cline. On this same date, Affiant observed Walter Jackson use a remote to open a detached garage #A3 and get into a red Dodge Avenger (TX DWM 254) with a paper sack in his hands. Later, on this same date, Walter Jackson was stopped for a traffic violation and a positive dog alert was given to the vehicle during the stop indicating the presence of an odor of narcotics. A subsequent search of the vehicle located approximately $6,000 in cash and prescription pills belonging to Walter Jackson. No arrest was made on this date.

On September 18, 2012, Affiant was notified by Detective Arredondo working at Frankensteins sports bar on Mason Rd. that he received information from patrons of the business that Walter Jackson made frequent stops on a nightly basis to Frankensteins and Vida Loca bars in Katy to illegally sell narcotics.

After conducting multiple days of surveillance, Affiant observed Walter Jackson as the driver of the red Dodge Avenger parked in garage #A3 and an occupant in the other vehicles listed in this affidavit. Affiant has observed both Walter Jackson and Laura Cline coming and going from apartment #10206 on multiple occasions. Affiant identified Walter Jackson as compared to his Texas driver's license photo. . . . Affiant also identified Laura Cline by her Texas driver's license photo. . . .

On October 1, 2012, Affiant was contacted by DPS Narcotics Detective C. Brown about Walter Jackson. Detective Brown informed

15

me through an active investigation she learned that Walter Jackson both supplies cocaine and illegal narcotics to the Katy area. Detective Brown further informed me Walter Jackson had created a fictitious business and was funneling large amounts of cash through the business. A subsequent meeting with Detective Brown determined that we had identified common suspects who had dealings with Walter Jackson's criminal activity.

On October 18, 2012, Affiant was conducting surveillance at Motel 6 in Katy at I-10 and Mason on a different investigation. At around 11:00 pm, Affiant observed Walter Jackson in the red Dodge Avenger drive to the back of Motel 6, meet with a female subject for 25 seconds and then drive away. Affiant followed Walter Jackson across the street to the Chilis parking lot and observed a male in a Nissan SUV exit his vehicle, meet with Walter Jackson through the passenger window and then both parties left the location. From Affiant's past experience and training as a narcotics investigator, Affiant knows these brief parking lot encounters are consistent with hand to hand drug transactions, specifically in this matter with a drug dealer making multiple transactions for various customers in a condensed period of time.

Putting aside all statements in the affidavit regarding the narcotics-detection dog sniffs at the apartment and garage, we now consider whether the remaining, legally-obtained information clearly establishes probable cause. *See Cuong Phu Le*, 463 S.W.3d at 877. We ordinarily would give great deference to the magistrate's probable-cause determination. *Id.* at 876–77. We may not do so here, however, because of the tainted information in the affidavit. *Id.* Nonetheless, we still must read the purged affidavit in accordance with *Illinois v. Gates*, 462 U.S. 213 (1983). *Id.* at 877. Consequently, we must interpret the affidavit in a commonsensical and realistic manner, drawing reasonable inferences from the untainted information in the affidavit, and we must not invalidate a warrant by interpreting the affidavit in a hyper-technical manner. *Cuong Phu Le*, 463 S.W.3d at 877; *State v. McClain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Probable cause exists if, under the totality of the circumstances, there is fair probability that contraband or evidence of

a crime will be found at a specified location. *Cuong Phu Le*, 463 S.W.3d at 878.

Applying this "flexible, non-demanding standard" and drawing the reasonable inferences the magistrate could have made, *id.* at 878, we conclude that ignoring all statements in the affidavit regarding the narcotics-detection dog sniffs at the apartment and garage, the remaining information in the affidavit clearly established probable cause. First, Officer Newton is a seasoned narcotics detective, and he averred that based on his training and experience, appellant's behavior is consistent with drug trafficking. Second, Newton's affidavit stated that appellant had a criminal history of manufacturing or delivering controlled substances and that he was a parole transfer for narcotics-related convictions in Louisiana. A suspect's criminal record can be considered when making a probable-cause determination. *Janecka v. State*, 739 S.W.2d 813, 825 (Tex. Crim. App. 1987) (citing *United States v. Harris*, 403 U.S. 573, 583 (1971)).

Next, Newton received information regarding appellant from a confidential informant, who has provided reliable information leading to arrests in prior investigations. The informant told Newton that appellant was selling cocaine and prescription drugs from his residence, garage, and vehicle. While information from an unnamed informant alone does not establish probable cause, the informant's tip, combined with independent police investigation, may provide a substantial basis for the probable-cause finding. *See id.* at 825. Here, the informant's claim that appellant was a drug dealer was corroborated by at least two other individuals arrested in subsequent investigations, as well as two other detectives working in the Katy area. Additionally, during his surveillance and investigation, Newton personally observed appellant engaging two times in conduct that Newton concluded was consistent with a hand-to-hand drug transaction. Finally, on the same day that Newton observed appellant open his garage and get into his vehicle

with a paper sack, appellant was stopped for a traffic violation, and a narcotics-detection dog alerted to the presence of narcotics. A search of the vehicle revealed $6,000 and prescription pills belonging to appellant.

Appellant's possession of a paper sack, in isolation, is an innocent fact that cannot establish probable cause. *See Cassias v. State*, 719 S.W.2d 585, 589 (Tex. Crim. App. 1986) (holding affidavit insufficient to establish probable cause where affiant alleged, among other things, that suspects were seen "carrying brick type packages believed to be marihuana" as well as plastic tubs and tubing). However, otherwise innocent activity may be sufficiently corroborated to support a probable cause finding if the "seemingly innocent activity becomes suspicious in light of the initial tip." *State v. Duarte*, 389 S.W.3d 349, 358 n.39 (Tex. Crim. App. 2012) (quoting *Gates*, 462 U.S. at 244–45 & n.13). In *Gates*, the Supreme Court noted:

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

462 U.S. at 243 n.13. Here, the paper sack becomes more suspicious in light of the fact that later the same day, a narcotics-detection dog alerted to the presence of narcotics in appellant's vehicle, and $6,000 cash and prescription pills were found inside. From this information, the magistrate could have inferred that appellant carried drugs from his apartment or garage into his vehicle via the paper sack. We restate that the affidavit should be interpreted in a commonsense, rather than hyper-technical manner. *See McClain*, 337 S.W.3d at 272.

Furthermore, the magistrate reasonably could have concluded from the statements in Newton's affidavit that appellant kept the majority of his contraband in his home and garage, choosing to deliver the drugs to his buyers rather than allowing them to come to his apartment to make their purchases. *See Rodriguez v. State*, 232 S.W.3d 55, 64 (Tex. Crim. App. 2007) ("And, although it is entirely possible that [the suspect] took all of the cocaine stored at the . . . garage with him when he left, it is at least as likely that the three kilo package was just a small part of the whole cache.") Moreover, the magistrate could have reasoned that, in conducting the hand-to-hand transactions, appellant carried only the amount of illegal drugs needed for each transaction instead of keeping his entire supply of drugs in his vehicle, a considerably less-private location than his apartment or garage. *See, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (concluding that "[t]he expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel"); *Keehn v. State*, 279 S.W.3d 330, 336 (Tex. Crim. App. 2009) (noting that Fourth Amendment case law "recognizes that individuals possess a greater privacy interest in a fixed residence" than in a mobile location like a vehicle).

We hold that these facts and inferences are sufficient to establish probable cause to search the apartment and garage. Putting aside all statements in the affidavit regarding the narcotics-detection dog sniffs at the apartment and garage, the remaining information in the affidavit clearly established probable cause. *See Cuong Phu Le*, 463 S.W.3d at 876–81; *Wright*, 401 S.W.3d at 822–23. We overrule appellant's second issue.

## IV.    Ineffective-Assistance-of-Counsel Claim

In his fourth issue, appellant claims that he received ineffective assistance at trial. Specifically, appellant alleges that his attorney failed to: (1) file a motion for

disclosure of the identities of the confidential informants or seek a hearing thereon; (2) file a motion for spoliation; (3) have appellant testify at the suppression hearing; (4) seek a jury instruction under Article 38.23 of the Texas Code of Criminal Procedure; and (5) file a motion for a new trial.

We examine claims of ineffective assistance of counsel by applying the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). *See Ex parte Jimenez*, 364 S.W.3d 866, 882–83 (Tex. Crim. App. 2012). Under *Strickland*, appellant must prove by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See id.* at 883.

Our review of defense counsel's performance is highly deferential, beginning with the strong presumption that the attorney's actions were reasonably professional and were motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). When the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). In most cases, the appellant is unable to meet the first prong of the *Strickland* test because the record is underdeveloped and does not adequately reflect the alleged failings of trial counsel. *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007).

A sound trial strategy may be imperfectly executed, but the right to effective

20

assistance of counsel does not entitle a defendant to errorless or perfect counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination." *Id.* (quoting *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992)). It is not sufficient that appellant show, with the advantage of hindsight, that his trial counsel's actions or omissions were merely of questionable competence. *Mata*, 226 S.W.3d at 430. Instead, to establish that the attorney's acts or omissions were outside the range of professionally competent assistance, appellant must show that counsel's errors were so serious that he was not functioning as counsel. *See Patrick v. State*, 906 S.W.2d 481, 495 (Tex. Crim. App. 1995).

Here, appellant did not file a motion for new trial alleging ineffective assistance of counsel, or develop a record of trial counsel's reasons for his actions. The record is silent as to counsel's trial strategy.

### A. Failure to File Motion for Disclosure of Identity of Confidential Informants

Appellant first complains that his trial counsel rendered ineffective assistance by failing to file a motion for disclosure of the identity of the confidential informants. Appellant admits that the State has a privilege not to disclose their identities under Rule 508(a) of the Texas Rules of Evidence, but he argues that an exception applies because the informants may have been able to "give testimony necessary to a fair determination of a material issue on guilt or innocence." *See* Tex. R. Evid. 508(c)(2). Appellant's argument is speculative and is not supported by the record. According to the affidavits, the informants provided

21

background information that officers were later able to corroborate through extensive surveillance of appellant. Thus, the testimony they could have provided was not necessary to a fair determination of guilt or innocence. *See Washington v. State*, 902 S.W.2d 649, 657 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd). Although appellant claims that "it appears that a confidential informant was purportedly an eyewitness to alleged offenses [committed] by [appellant]" and that "the Confidential Informant's identity was crucial for purposes of impeaching Laura Cline," nothing in the record substantiates these claims. Officer Newton was questioned about the confidential informants at the suppression hearing, and he never indicated that either informant witnessed any offenses or participated in the offenses. The informants' information was only used to establish probable cause for the search warrants. "When the informant is not present when a search warrant is executed and the informant does not participate in the offense for which the defendant is charged, the identity of the informant does not need to be disclosed because the informant's testimony is not essential to a fair determination of guilt." *Id.* Therefore, because the identity of the informants did not have to be disclosed under Rule 508(c)(2), counsel did not render ineffective assistance by failing to file a motion to disclose their identities. *See Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (holding that counsel is not required to engage in the filing of futile motions); *Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (holding same). Appellant's first sub-issue is overruled.

## B. Failure to File Motion for Spoliation

Appellant also argues that he received ineffective assistance because his counsel did not move for a hearing on "whether there has been a spoliation of the evidence, whether there has been an intentional, or negligent, withholding of

evidence, or a destruction of the evidence that is favorable to the defense."[11] Appellant seems to be arguing that counsel failed to request various dashboard videos, call logs, and tapes that "would establish the time line of events related to the searches and arrest." He claims that counsel's failure to ask for these items or investigate whether they had been destroyed caused him to "[lose] his opportunity to question whether the search of the premises in this case was pursuant to a lawfully issued warrant." We disagree.

As the State points out, the trial court conducted a lengthy suppression hearing to determine the legality of the searches. The hearing spanned two days, and the court heard testimony from the investigating officer and the canine handler. Appellant's trial counsel cross-examined both witnesses, and nothing in the record indicates that any evidence was withheld or destroyed. Furthermore, appellant's contention that these tapes and logs would show that the searches were unlawful is speculative and without merit. Appellant points out that officer testimony indicated appellant was stopped for a traffic violation at 4:56 p.m., but the warrants for the searches of his apartment and garage were issued at 5:30 p.m. We fail to see the significance of this point. We already have determined that officers searched appellant's apartment and garage pursuant to valid warrants. The fact that officers stopped appellant for a traffic violation prior to the issuance of the warrants does not change our analysis.

Because appellant has not demonstrated that any evidence was in fact withheld or destroyed, we cannot say that counsel's decision to not request a hearing on the issue amounted to ineffective assistance. As previously mentioned, the record is silent as to counsel's trial strategy. Allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the

---

[11] Appellant makes a similar argument, couched in terms of due process, in his fifth issue.

alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). Because the record here is underdeveloped, we must presume that counsel's decision was motivated by sound trial strategy. *See Strickland*, 466 U.S. at 689 (observing that a fair assessment of attorney performance must be made without the distorting effects of hindsight). Appellant's second sub-issue is overruled.

## C. Failure to Have Appellant Testify at Suppression Hearing

In his next sub-issue, appellant argues that he received ineffective assistance because counsel did not call him to testify as a witness at the suppression hearing. The right to testify can only be waived by a defendant, not his counsel. *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1998) (op. on reh'g). Such a waiver must be made by a defendant knowingly and voluntarily. *Id.*

The record presented for our review contains no evidence for us to consider in determining whether appellant's trial counsel did not call appellant to the stand because appellant voluntarily and knowingly waived his right to testify at the suppression hearing. Because appellant did not raise the issue of ineffective assistance below, appellant's trial counsel was not called as a witness or given the opportunity to testify as to the interactions between them. "[C]ounsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent." *Bone*, 77 S.W.3d at 836. When the trial record is incomplete and does not provide enough evidence on which to base reversal, we will refrain from speculating as to what exactly happened in the trial court. *Id.* at 833 n.13, 836; *Thompson*, 9 S.W.3d at 813–14. There is no evidence in the record as to whether trial counsel and appellant came to an agreement based on sound trial strategy that appellant should not testify at the suppression hearing. Appellant has not overcome the strong presumption that trial counsel performed within reasonable standards. *See Bone*, 77 S.W.3d at 833.

24

Therefore, we overrule appellant's third sub-issue.

**D. Failure to Seek Jury Instruction Under Article 38.23**

Appellant also claims that trial counsel rendered ineffective assistance by failing to seek an article 38.23 instruction. *See* Tex. Code Crim. Proc. art. 38.23. Under article 38.23, the court is required to exclude any evidence that it finds, as a matter of law, was obtained in violation of the Constitution or the laws of the United States or the State of Texas. *Atkinson v. State*, 923 S.W.2d 21, 23 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002). However, when there is a fact issue regarding the manner in which the evidence was obtained, article 38.23 permits the court to submit the question to the jury with an instruction that if the jurors find that the evidence was obtained in violation of the law, they are not to consider it in reaching their verdict. *Id.*

A defendant is only entitled to an instruction under article 38.23 when the record demonstrates a factual dispute concerning how the evidence was obtained. In this case, contrary to appellant's contention, there is no factual dispute regarding how the evidence was obtained. Appellant claims that there was "conflicting search warrant testimony" which "raised the conflicting fact issue of whether the apartment and garage were searched pursuant to the search warrants executed in this case." Appellant argues that a fact issue exists because Officer Newton testified that the search warrants were issued at 5:30 p.m., but Officer Baker testified that he arrived at the complex where the search was conducted between 3:00 p.m. and 4:00 p.m. Baker testified that he was initially contacted by Newton to conduct surveillance at the apartment complex while Newton was away obtaining the warrants. Baker never stated that the warrants were in fact executed

before 5:30 p.m., only that he was at the complex before they were issued. [12] This does not create a factual dispute. [13] Thus, appellant was not entitled to an instruction under article 38.23. *See Cummings v. State*, 401 S.W.3d 127, 132 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (rejecting claim of ineffective assistance when trial counsel failed to request article 38.23 instruction). Appellant's trial counsel's failure to request an instruction to which appellant was not entitled is not ineffective assistance. *See id.* We overrule appellant's fourth sub-issue.

### E. Failure to File Motion for New Trial

Lastly, appellant argues trial counsel was ineffective because counsel did not file a motion for new trial based on alleged *Brady* violations. Appellant speculates that Cline received undisclosed offers of leniency in exchange for her testimony. [14]

---

[12] Appellant's brief misconstrues Baker's testimony. Appellant states: "Sargent (sic) Baker testified that Detective Newton had asked for his assistance in executing the search warrant. He testified that he arrived at the location to be searched *for this purpose* at approximately 3:00 p.m. or 4 p.m." (emphasis added). However, Baker testified as follows:

Q: Now, take me back to October 24th, 2012. I believe you said that on that particular day, you were contacted by Agent Newton just to, at first, conduct surveillance; is that correct?

A: Correct.

Q: Okay. For that particular day. Do you recall approximately what time you arrived at the property where the search warrant was going to be executed that day?

A: It was well after lunch. I would probably say around 3:00 or 4:00 maybe.

[13] Appellant also claims a factual dispute exists regarding "whether the police followed the constitutional requirement of the 'knock and announce rule'" because, according to appellant, Cline "dispute[d] being shown a search warrant or opening the apartment door for the Task Force." However, a review of Cline's testimony indicates that the police did announce their presence. She stated: "I was upset, yes. I thought I was—it was someone there robbing the apartment. I didn't know what was going on because they came in with no—they kind of shocked themselves when they opened the door. They were like, task force." Furthermore, no one disputed Cline's testimony that she did not open the door herself and was not shown the warrant. We conclude that this testimony did not create a factual dispute.

[14] Appellant complains further about the potential *Brady* violations in his sixth issue. We reject this argument for the reasons stated below.

However, there is no evidence that any such offers were made to Cline, and, during trial, both the State and appellant's counsel questioned Cline regarding her motivations for testifying against appellant. Based on the results of his cross-examination, counsel could have reasoned that filing a motion for new trial on this ground would have been futile. As noted above, counsel is not required to file futile motions. *Mooney*, 817 S.W.2d at 698; *Wert*, 383 S.W.3d at 753.

Additionally, when a motion for new trial is not filed in a case, there is a rebuttable presumption that it was considered by the appellant and rejected. *Oldham v. State*, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998) (op. on reh'g); *see also Castillo v. State*, 186 S.W.3d 21, 31 (Tex. App.—Corpus Christi 2005, pet. ref'd); *Donnell v. State*, 148 S.W.3d 674, 676 (Tex. App.—Beaumont 2004, no pet.). In this case, there is no evidence to rebut the presumption that counsel adequately informed appellant of his right to file a motion for new trial and that appellant rejected the option. Further, there is no evidence to show that appellant was interested in filing a motion for new trial or that counsel did not adequately assist him in doing so. Therefore, we cannot sustain appellant's ineffective assistance claim based on his final sub-issue. We overrule appellant's fourth issue.

## V. Destruction of Evidence

In his fifth issue, appellant argues that "the destruction of and/or withholding of all police call logs and communication tapes . . ., the traffic stop videos with time log readings, jail entry videos with time log readings for the jailing of Jackson, [and] field notes . . . deprived him of his rights under the Due Process Clause of the Fourteenth Amendment."

In response, the State notes that "Appellant does not point out anywhere that such items were ever requested, much less where the records show that they were wrongfully withheld or destroyed. Further, Appellant does not point out where any

objection was made to such supposed withholding or destruction, nor does he point out where any request for a continuance was made." Finally, the State argues that even if the evidence was wrongfully destroyed or withheld, appellant has not demonstrated that the evidence was material.

Reviewing the record, we find no indication that appellant brought this complaint to the attention of the trial court. Furthermore, appellant seemingly admits as much in his brief, claiming that he received ineffective assistance of counsel because his attorney failed to request a hearing on whether "there has been a spoliation of the evidence, whether there has been an intentional, or negligent, withholding of evidence, or a destruction of the evidence that is favorable to the defense."

To preserve error for appellate review, an appellant must present to the trial court a timely, specific objection and obtain an adverse ruling. *See* Tex. R. App. P. 33.1(a); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991); *see also Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (explaining that even constitutional error may be waived); *Alexander v. State*, 137 S.W.3d 127, 130–31 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding that failure to object to trial court's violations of federal and state due process rights waives appellate review of those claims). Therefore, we conclude appellant waived his complaint on appeal by failing to raise it in the trial court. *See Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002) (defendant waived due process complaint when raised for first time on appeal).

However, even if appellant had not waived this argument, he would not prevail. In *Illinois v. Fisher*, the United States Supreme Court considered whether the destruction of the cocaine underlying appellant's possession charge was a violation of his due process rights. 540 U.S. 544, 545 (2004). In determining that

the State's destruction of the evidence did not violate due process, the Court explained the distinction between "material exculpatory evidence" and "potentially useful evidence." *Id.* at 547–48. The Court noted that if the evidence destroyed was material, the officer's good or bad faith was irrelevant. *Id.* at 547 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Agurs*, 427 U.S. 97, 110 (1976)). However, if the evidence was merely potentially useful, the failure to preserve the evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 547–48 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Here, appellant has not demonstrated that (1) such logs, recordings, or notes existed; (2) the State in fact destroyed or withheld any of these items; (3) the items were "material exculpatory evidence"; or (4) if they were not material, that they were destroyed in bad faith. Appellant's brief merely asserts that "[t]he evidence . . . on its face meets this [materiality] standard." Without more, we cannot hold that the State violated appellant's due process rights. We overrule appellant's fifth issue.

## VI. Failure to Disclose Alleged Offers of Leniency

In his sixth issue, appellant contends that the State failed to reveal any promises or agreements between the State and any witnesses or confidential informants. Specifically, appellant claims that dismissal orders were signed in five cases against Laura Cline.[15] He argues that the State "intentionally created a false impression before the jury" by not revealing any benefits Cline received in exchange for her information or testimony.

---

[15] Appellant also notes that a dismissal order was signed in a case against Michael Dunne. Appellant was a passenger in Dunne's vehicle when it was stopped and searched on October 24, 2012. The trial judge suppressed all evidence recovered during the traffic stop, and Dunne did not testify at appellant's trial.

In response, the State concedes that it would have violated its duties under *Brady* had it not made the defense aware of any such offers of leniency; however, the State contends that appellant has not cited to anything in the record to indicate that an offer of leniency was made. The State also points out that Cline was questioned by both the State and appellant regarding any possible bias she may have had for providing testimony.

Appellant's argument implicates the State's affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment. *Brady*, 373 U.S. at 87. The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when it is requested. *See Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992). To establish a due process violation under *Brady*, a defendant must show that: (1) the State failed to disclose evidence in its possession; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is "material," that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Webb v. State*, 232 S.W.3d 109, 114 (Tex. Crim. App. 2007). The evidence may be material to either guilt or punishment. *Brady*, 373 U.S. at 87. Evidence that could be used effectively to impeach a prosecution witness is evidence favorable to the defendant for *Brady* purposes. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *Arroyo v. State*, 117 S.W.3d 795, 796 n.1 (Tex. Crim. App. 2003).

This issue is being raised for the first time on appeal. In fact, appellant complains that he received ineffective assistance of counsel because a motion for new trial was not filed on this ground. *Brady* claims are typically raised in a motion for new trial. *See, e.g.*, *Clarke v. State*, 270 S.W.3d 573, 580–81 (Tex. Crim. App. 2008); *Keeter v. State*, 175 S.W.3d 756, 760–61 (Tex. Crim. App. 2005). This is because "a *Brady* claim requires that a defendant show by a

preponderance of the evidence that evidence was withheld, that it was favorable to the defense, and that the evidence was material." *Keeter*, 175 S.W.3d at 760. Such a showing can be made with evidence presented at a hearing on a motion for new trial. *See Hall v. State*, 283 S.W.3d 137, 175–79 (Tex. App.—Austin 2009, pet. ref'd) (reversing appellant's sentence and remanding for new trial on punishment based on evidence presented at hearing on motion for new trial). In this case, however, appellant failed to raise a *Brady* claim in the court below. Accordingly, appellant has failed to preserve error on this issue. *See Keeter*, 175 S.W.3d at 759–60; *Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.). We therefore overrule appellant's sixth issue.

## VII. Denial of Motion for Mistrial

In his seventh and final issue, appellant claims that the trial court erred in denying his motion for a mistrial. Specifically, appellant contends that the trial court should have granted his motion after Laura Cline testified that appellant "had a record from Louisiana." Appellant immediately moved for a mistrial, but the trial judge denied the motion. The judge then instructed the jury to disregard Cline's statement regarding appellant's criminal history.

We review a trial court's denial of a motion for mistrial for abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Id.* A mistrial is a remedy intended for extreme circumstances, when prejudice is incurable and less drastic alternatives have been explored. *See id.* at 884–85. In determining whether a prejudicial event was so harmful as to warrant reversal on appeal, we consider the prejudicial effect, any curative measures taken, and the certainty of conviction absent the prejudicial event. *See Hawkins v. State*, 135

S.W.3d 72, 77 (Tex. Crim. App. 2004).

Generally, a witness's reference to a defendant's criminal history, standing alone, is cured by a prompt instruction to disregard. *Jackson v. State*, 287 S.W.3d 346, 354 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also Ladd v. State*, 3 S.W.3d 547, 571 (Tex. Crim. App. 1999) (holding instruction to disregard cured witness's improper reference to defendant's multiple juvenile arrests); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) (concluding witness's reference to defendant having "recently been released from the penitentiary" cured by instruction to disregard). An exception to this general rule exists, such that a mistrial is required, when the improper testimony is clearly calculated to inflame the minds of the jury and is of such a character to suggest the impossibility of withdrawing the impression produced on the minds of the jury. *Hudson v. State*, 179 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Cline's reference to appellant's prior record does not constitute such improper testimony. Rather, the challenged testimony closely resembles the references that have been cured by an instruction to disregard. *See Jackson*, 287 S.W.3d at 354; *Ladd*, 3 S.W.3d at 571; *Kemp*, 846 S.W.2d at 308. We must presume that the jury followed the trial court's instructions and conducted itself accordingly. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Therefore, appellant has not shown that the trial court's prompt and unequivocal instruction to disregard was insufficient to cure harm for any impression left upon the jury. *See Hudson*, 179 S.W.3d at 738–39. We overrule appellant's seventh issue.

**CONCLUSION**

We affirm the judgment of the trial court.

/s/    Ken Wise
        Justice

Panel consists of Chief Justice Frost and Justices Boyce and Wise.
Publish — TEX. R. APP. P. 47.2(b).